Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Anamay M. Carmel (SBN 298080)
ACarmel@PasichLLP.com
Arianna M. Young (SBN 314043)
AYoung@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7860
Facsimile:   (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HILARY SWANK, an individual, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR BENEFITS DUE AND DECLARATORY RELIEF UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974** |
| THE BOARD OF TRUSTEES OF THE SAG-AFTRA HEALTH PLAN, | |
| Defendant. | |

"As all historians know, the past is a great darkness, and filled with echoes."

― Margaret Atwood, *The Handmaid's Tale*

Plaintiff Hilary Swank complains of Defendant, The Board of Trustees of the SAG-AFTRA Health Plan ("the Trustees") and alleges as follows:

---

**COMPLAINT**

S041.001/289190.1

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this matter under sections 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974 ("ERISA") as it involves a claim by Swank for employee benefits under an employee benefit plan regulated and governed by ERISA. Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this matter involves a federal question.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1132(e)(2) (special venue rules applicable to ERISA actions) because all of the events that gave rise to Swank's claims arose in this District, Swank's claims for benefits were denied in this District, the ERISA-governed plan at issue was administered by the Trustees in this District, and the Trustees may be found in this District.

## NATURE OF THE ACTION

3. This matter addresses the shockingly antiquated question of whether the sole purpose of a woman, and specifically her ovaries, is to procreate. When faced with a claim for insurance benefits for the medically necessary treatment of ovarian cysts and endometriosis, the Trustees answered "yes," determining that there could be no possible reason to treat those conditions other than for the purpose of trying to conceive.

4. Swank has suffered from recurrent malignant ovarian cysts for over 11 years. Beginning in 2009, she submitted claims for coverage for treatment of her ovarian cysts to the Trustees under the SAG-AFTRA Health Plan (the "Plan"). At first, the Trustees agreed to cover that treatment. However, in 2015, the Trustees reversed course and stopped allowing Swank's claims for treatment of ovarian cysts.

5. It also just so happened that around the same time as when the Trustees no longer agreed to allow Swank's claims, Swank was undergoing procedures to preserve her ability to conceive in the future. Seizing upon Swank's choice to keep her options open, the Trustees pointed to an exclusion in the Plan for "infertility treatment," relying on the notion that the only purpose of preserving the health of an

2
**COMPLAINT**

S041.001/289190.1

ovary is to procreate. Despite Swank's, and her board-certified doctors', insistence that she was not seeking coverage for fertility treatment, but only for treatment for her ovarian cysts, the Trustees dug in their heels. The Trustees repeatedly said that there was no medically necessary reason to treat or monitor ovarian cysts other than for "infertility treatment."

6. This action is brought for the purpose of obtaining benefits under the terms of an employee benefit plan; to clarify and enforce Swank's past, present and future rights to benefits under an employee benefit plan; and to obtain other equitable relief, including an declaration that the Trustees must qualify Swank for the future receipt of benefits related to the treatment of ovarian cysts and endometriosis and to pay Swank benefits to which she is entitled; for pre-judgement and post-judgment interest; and for attorneys' fees and costs.

## THE PARTIES

7. Swank is an actress and film producer and the recipient of many awards, including two Academy Awards, two Golden Globe Awards, two Critic's Choice Awards, and a Screen Actors Guild Award. Swank has been a member of SAG-AFTRA, the film and television performers' union since February 9, 1990 and has been a plan participant covered by the Plan and the precursors to the Plan since the same date. During her career, she has been an active supporter and spokesperson for SAG-AFTRA and SAG, its predecessor.

8. The Trustees are the Plan Administrator, as defined by ERISA in 29 U.S.C. § 1002-16(a), of the Plan, "a collectively bargained, joint-trusteed, labor management trust." *See* SAG-AFTRA Health Plan Summary Plan Description at 125 ("The administrator of the Plan is the Board of Trustees . . . . The routine administrative functions are performed by the Plan."). A true and correct copy of the Summary Plan Description is attached and incorporated herein as Exhibit A. The Trustees' principal place of business is in Los Angeles County, California.

## THE SAG-AFTRA HEALTH PLAN

9. Swank is informed and believes, and on that basis alleges, that the Plan is a self-funded, collectively bargained, joint-trusteed, labor management trust affiliated with, but a separate legal entity from, SAG-AFTRA.

10. The Plan provides health insurance benefits for SAG-AFTRA union members who meet certain eligibility requirements. *See* Ex. A at 8.

11. Swank is informed and believes, and on that basis alleges, that the Plan is jointly administered by the Trustees with representation from both SAG-AFTRA and contributing industry employers.

12. According to the Summary Plan Description, for purposes of administration of the Plan, the "Plan's Trustees and staff are assisted by professional consultants, including legal counsel, investment advisors and managers, health benefit consultants, actuaries and certified public accountants." *See* Ex. A at 4.

13. According to the Summary Plan Description, the Trustees, headed by the Plan's Chief Executive Officer, Michael Estrada, are "responsible for setting the benefits, rules, and regulations of the Plan and generally overseeing Plan operations," including denials of coverage. *See* Ex. A at 125.

14. According to the Summary Plan Description, "The Plan provides an extensive package of benefits that help you pay for everyday medical costs and wellness services, as well as expenses resulting from illness or injury." *See* Ex. A at 50.

15. For in network coverage, the Plan pays 90% of the contract rate and has an annual $150 deductible. *See* Ex. A at 46.

16. The Plan provides coverage for "medically necessary" "lab and diagnostic tests such as ultrasounds . . . ," "Physician services," and "Wellness or preventive services." *See* Ex. A at 58-59, 132.

17. Under the Plan, a treatment is medically necessary if it meets the following requirements: (1) it is appropriate and required for diagnosis or treatment of the accidental injury, sickness, pregnancy or other medical condition; (2) it is safe and

S041.001/289190.1

effective according to accepted clinical evidence reported by generally recognized medical professionals or publications; (3) there is not a less intensive or more appropriate diagnostic or treatment alternative that could have been used in lieu of the service or supply provided; and (4) it is ordered by a physician (except where the treatment is rendered by a medical provider and is generally recognized as not requiring a physician's order).  *See* Ex. A at 70-71, 89-90, &132.

## SWANK'S CLAIM FOR COVERAGE AND SAG-AFTRA'S IMPROPER DENIALS

18. In 2008, Swank was diagnosed with ovarian cysts.

19. Ovarian cysts are known to grow rapidly and prolifically, and can result in debilitating pain, ovarian torsion, and significant hormonal imbalances.

20. Due to persistent ovarian cysts, Swank's left ovary was destroyed and removed during emergency surgery in 2008.  Since then, she has experienced recurrent cyst formation in her remaining ovary.  Her history of ovarian cysts has shown that her ovarian cysts develop rapidly with a destructive nature, so she is required to frequently and carefully monitor the development of any cysts.  Because of the cysts' recurrence, she is frequently required to undergo aspirations of the cysts, sometimes multiple times per year.

21. In 2019, Swank was also undergoing testing to further diagnose endometriosis.  Endometriosis is known to cause the proliferation of uterine tissue outside of the uterus, often resulting in pain and digestive issues.

22. Because of ovarian cysts and endometriosis, Swank suffers from extreme and debilitating degrees of acid reflux, pelvic pain throughout her lower abdomen, bloating, cramping, and fatigue, among other symptoms.

23. Swank has and continues to receive treatment for ovarian cysts, including monitoring their growth and treating the cysts and endometrial tissue with ultrasounds, bloodwork, aspirations, and surgery as needed.

S041.001/289190.1

24. Swank began submitting claims to the Trustees for coverage under the precursor to the Plan for her treatment related to ovarian cysts beginning in 2009.

25. Initially, upon receipt, the Trustees denied coverage for these treatments, citing an exclusion for "infertility treatment."

26. However, once Swank alerted the Plan's precursor to the fact that she was not trying to conceive in 2011, the Plan's precursor agreed to cover all costs "for services in connection with the treatment of ovarian cysts."

27. Despite trying to treat Swank's ovarian cysts with birth control pills, this form of treatment was ineffective. Instead, Swank's doctors insisted on regular ultrasounds to monitor the growth of the ovarian cysts and surgical aspirations of the cysts as necessary.

28. Swank continued to submit claims for the treatment of her ovarian cysts, and they were paid in part until late 2015.

29. Between January 1, 2017, and continuing through the present, Swank continued to monitor and receive treatment for ovarian cysts and endometriosis through ultrasound monitoring of her remaining ovary and endometrial tissue growth. Swank also continued to exercise her constitutional right to privacy by undergoing treatments to preserve her ability to conceive at some point in the future if she so chose.

30. Between January 1, 2017, and continuing through the present, Swank continued to submit claims for coverage for ultrasound treatments to monitor her ovarian cysts and endometriosis to the Trustees.

31. Swank did *not* submit claims to the Trustees for any treatments undergone to preserve her ability to conceive and has made a conscientious effort to distinguish such treatments from treatments for her ovarian cysts.

32. Swank's treating physicians determined that "less intensive" treatments for endometriosis and ovarian cysts, such as hormonal birth control pills, were not effective and therefore not a reasonable alternative, and recommended that the best

6
**COMPLAINT**

course of treatment to save her sole remaining ovary was to monitor it with ultrasounds.

33. The purpose of treating and monitoring Swank's sole remaining ovary was unrelated to any "infertility treatment." Rather, Swank's doctors were focused on saving her ovary to prevent the risk of debilitating medical conditions, including cancer, loss of estrogen production, premature menopause, osteoporosis, depression, hyperlipidemia (high cholesterol in the blood), coronary artery disease, arthritis, asthma, chronic obstructive pulmonary disease, chronic pain, fatigue, chest pain, heart palpitations, muscle spasms, insomnia, recurrent urinary tract and yeast infections, and even early death.

34. However, in 2017, the Trustees informed Swank that none of the treatments post-dating January 1, 2016 would be covered under the Plan because they had decided that the treatment was "infertility related," and therefore not covered by the Plan.

35. Following the Trustees' decision, not only was Swank's physical health suffering, but she was undergoing a great amount of emotional suffering as well. On top of Swank's fear of not knowing when the next painful episode would occur, she had to contend with the mental weight of the Trustee's oppressive position in refusing to protect the overall health of a woman. Instead, the Trustees put form over the substance of her treatments by repeatedly denying that there was any purpose for them other than for "infertility treatment."

36. In 2019, Swank filed a timely appeal of the denial of benefits.

37. On October 8, 2019, the Trustees, acting on behalf of the Plan, sent Swank's medical file to an anonymous OB-GYN doctor (the "Consultant") for review.

38. On October 14, 2019, the Consultant reviewed Swank's medical records for the Plan. The Consultant upheld the Trustees' denial of benefits, stating that "pelvic ultrasounds and laboratory testing provided for this patient was for the purpose of monitoring and treating infertility . . . not PCOS or endometriosis."

39. On December 11, 2019, the Trustees requested clarification from the Consultant regarding the standard of care for both PCOS (ovarian cysts) and endometriosis.

40. On December 12, 2019, the Consultant re-reviewed Swank's medical records and stated that "the testing and treatment provided for this patient were not standard of care for diagnosis or treatment of PCOS or endometriosis."

41. On December 18, 2019, the Trustees notified the Consultant that Swank's treating physician requested a telephone conference with them.

42. On January 2, 2020, a peer-to-peer review of Swank's treatment was conducted by Swank's treating physician and the Consultant via telephone. On the same date, the Consultant reported to the Trustees that based on the peer-to-peer discussion, the Consultant would uphold their previous decision for denial.

43. On January 20, 2020, the Trustees notified Swank of their denial of her appeal and again suggested the use of "progestin, extended cycle combined oral contraceptives and NSAIDS" as treatment options.

44. On April 28, 2020, Swank took the last step available to her in the appeals process and requested an external review of the Trustees' decision to deny coverage.

45. Along with this appeal, Swank provided the Trustees with numerous letters from Swank's treating physicians, all of whom stated that regular monitoring and treatment of Swank's ovarian cysts was necessary to address Swank's dangerous symptoms. For example, one of Swank's treating board certified physicians stated:

> [Swank has] a very high risk of ovarian torsion and subsequent emergent surgery and potentially causing her to lose her ovary and therefore place her into early surgical menopause. . . . It is my medical opinion that these periodic pelvic ultrasounds to monitor for ovarian cysts are necessary regardless of any fertility endeavors for the health of her remaining ovary. . . . If [Swank] loses her remaining ovary, she will have early onset menopause

1 which is associated with a myriad of medical issues that will affect
2 her overall health and well-being for reasons beyond fertility.

3     46.     The Trustees asked AllMed to conduct the external review.

4     47.     On June 12, 2020, Swank received a letter from AllMed, informing her
5 that it was upholding the prior decisions of the Plan. Specifically, AllMed stated that
6 "[g]iven the patient's diagnoses and health condition, the frequency of pelvic echos []
7 from the dates of service 2/29/16 through 5/21/19 are not considered medically
8 necessary." Further, despite not having undergone in vitro fertilization or frozen
9 embryo transfers during that time period, AllMed claimed that she had. The Trustees
10 relied on AllMed's determination in upholding their prior decisions.

11     48.     AllMed further stated that "[i]n 2018, a 32 mm cyst was aspirated to
12 avoid cancellation of infertility and ovarian stimulation treatments." However, the
13 aspiration of the cyst was performed to prevent Swank from potentially losing her
14 ovary and worse, including death, and would have had to have been performed
15 regardless of any "infertility treatments," especially because Swank was not being
16 treated for "infertility" in the first place.

17     49.     Having exhausted her administrative appeals, Swank brings this lawsuit.

## FIRST CAUSE OF ACTION

**(For Benefits Pursuant to 29 U.S.C. § 1132(a)(1)(B))**

20     50.     Swank realleges and incorporates by reference paragraphs 1 through 49
21 above.

22     51.     Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) of ERISA permits a
23 plan participant to bring a civil action to recover benefits due under the terms of a
24 plan, to enforce rights under the terms of a plan, and/or to clarify rights to future
25 benefits under the terms of the plan.

26     52.     The Plan obligates the Trustees to cover medically necessary pelvic
27 ultrasounds under the terms of the Plan.

28

S041.001/289190.1

53. Swank's doctors diagnosed her with malignant ovarian cysts in 2008 and later with endometriosis. This diagnosis was confirmed with lab testing and observation over the course of more than a decade of medical examinations. The support and documentation for this diagnosis, including documentation and testing sufficient to prove a diagnosis pursuant to standard guidelines, were provided to the Trustees on multiple occasions during the time Swank has been covered under the Plan.

54. Due to the documented ineffectiveness of hormonal birth control for treatment of her ovarian cysts, Swank's treating physicians determined that "less intensive" treatments for ovarian cysts were not available to Swank. Swank's physicians further determined that the best course of treatment, in order to prevent the loss of her ovary and life-threatening diseases, was to monitor the ovary with pelvic ultrasounds and aspirate them as necessary.

55. The Trustees denied Swank's claims on the grounds that the pelvic ultrasounds and aspirations were not "medically necessary," completely disregarding the very real risk of her losing her remaining ovary. Specifically, the Trustees claimed that "the services provided were not medically necessary and not the standard of care for the diagnoses given . . . and were done for the purposes of infertility treatment."

56. However, Swank's physicians ordered the ultrasounds and aspirations, which were appropriate, required, safe, effective, and minimally invasive treatments for her diagnoses, and there is not a less intensive or more appropriate treatment available to Swank. Swank's doctors made this determination based on the fact that Swank had already lost one ovary because of malignant cysts and prolific endometriosis, and her history informed their decision that they needed to effectively protect her remaining ovary. The need to protect her remaining ovary was unrelated to "infertility treatment."

57. The Trustees have not paid, and still refuse to pay, Swank the full benefits due to her under the Plan. Specifically, the Plan obligates the Trustees to pay for the cost of the ultrasounds and aspirations performed on Swank in treating her for ovarian cysts and endometriosis, but the Trustees have denied Swank's claims and refused to pay any benefits to her.

58. Swank has completed all steps required prior to the filing of this Complaint under the Plan and ERISA, including appealing and requesting both an internal and external review of the Trustees' denial of benefits pursuant to 29 U.S.C. § 1133.

59. The Trustees' decision to deny benefits to Swank on the basis of medical necessity was erroneous, arbitrary, capricious, and an abuse of discretion. By wrongfully denying Swank payment of benefits, the Trustees have violated ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) and the terms of the Plan.

60. Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) and the Plan, Swank is entitled to medical coverage benefits for the cost of the medically necessary pelvic ultrasounds and aspirations performed on her.

61. Pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), Swank is also entitled to recover her attorneys' fees and costs incurred in bringing this cause of action. The amount of these fees is currently unknown. When the amount is determined, Swank will seek leave from this Court to amend this Complaint to state the actual amount of these fees.

## SECOND CAUSE OF ACTION

**(For Declaratory Relief Pursuant to 29 U.S.C. § 1132(a)(1)(B))**

62. Swank realleges and incorporates by reference paragraphs 1 through 61 above.

63. A controversy now exists between Swank and the Trustees as to whether the Trustees are required to pay for treatment and monitoring of Swank's ovarian cysts and endometriosis as determined to be medically necessary by Swank's

S041.001/289190.1

physicians. Swank contends that the Trustees are obligated to provide medical benefits for the treatment and monitoring of her ovarian cysts and endometriosis. The Trustees have denied these obligations and contend that they are not obligated to provide coverage for the monitoring and treatment of ovarian cysts and endometriosis.

64. Therefore, declaratory relief is necessary to determine Swank's rights under the Plan. Specifically, Swank seeks a declaration by this Court that the Trustees are required to pay for the requested treatment and in accord with her contentions above.

65. A declaration is necessary at this time in order that the parties' dispute may be resolved and that the parties be aware of their respective rights and duties.

66. Pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), Swank is also entitled to recover her attorneys' fees and costs incurred in bringing this cause of action. The amount of these fees is currently unknown. When the amount is determined, Swank will seek leave from this Court to amend this Complaint to state the actual amount of these fees.

## PRAYER FOR RELIEF

WHEREFORE, Swank prays for relief as follows:

### ON THE FIRST CAUSE OF ACTION

1. For the full amount of all benefits due and owing under the Plan; and
2. For payment of pre-judgment and post-judgment interest as allowed under ERISA.

### ON THE SECOND CAUSE OF ACTION

3. For a declaration in accord with Swank's contentions as stated above.

### ON BOTH CAUSES OF ACTION

4. For reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g);
5. For costs of suit herein; and

6. For such other, further, and/or different relief as may be deemed just and proper.

DATED: September 8, 2020        PASICH LLP

By: _/s/ Kirk Pasich_
Kirk Pasich

Attorneys for Plaintiff